Good morning, your honors. Tom Schlesinger on behalf of defendant Christian Osvaldo Aguirra, may it please the court I'd like to reserve maybe two or three minutes at the end if needed. The issues I'd like to discuss today relate to the RICO conspiracy conviction, the dual role instruction, FRERETA, and the continuance claim or the lack of the grant of the final continuance request claim if time is allowed. Starting with the RICO conspiracy conviction, the government failed to prove a pattern of racketeering activity in this case. It had to prove either that there were two acts of extortion or one act of extortion and a proof of a conspiracy to commit murder. The defendant was not an active participant in this conspiracy when he was in prison. He was in prison from approximately 2003 until his release in March of 2010. There was one act of extortion that was proven through the admission of the wiretap evidence and in particular a call, well, actually it wasn't a wiretap call, it was an intercepted prison call between the defendant and his brother-in-law where it was established that there were extortionate funds that were delivered or an attempted delivery was made to the defendant's ex-wife who was the brother of the other extortion. This is the delivery where there was a specific reference to the money being from the swap meet? There was something about the swap meet. It didn't say, it wasn't specifically it came from the swap meet, but it was the money. There was something in the conversation about the swap meet and we're not contesting the fact that there was proof of that one predicate act of extortion. The problem here, before I get to conspiracy to commit murder, the problem as to the proof of the second extortionate act is that any proof that there may have been was based on hearsay alone and under the Tilly decision that was decided by the government, because of that fact, the evidence had to show the defendant's participation in that second act of extortion. All we had was the testimony of Detective Trujillo, if you can recall. He is the one that we have a problem with in terms of the absence of the dual role instruction. He was called and as part of his lay opinion testimony, he discussed what he believed to be proof of a second act of extortion. And I will get to that momentarily. Turning to the conspiracy to commit murder, you can recall in the evidence that there were a number of factions that made up the 38th Street Gang. And so you had this one faction that was led by Black Segura, Louis Orozco, whose moniker was Penguin. Sometimes I'll talk in the context of monikers. Lorenzo Gonzalez, who is also known as Grumpy. And the individual who did their bidding at the swap meet, who was Alvarez, who later became the cooperating witness and testified for the government in the case. Now recall that that government claimed the defendant was possibly a part of, and this was the Harpies Gang. The Harpies Gang was the faction that was run at the direction of Danny Roman out of the Pelican Bay State Prison Facility with his daughter, Bianna Roman, and then this guy, David Carpentiniero. They were competing for control of the swap meet with the Orozco-Gonzalez-Alvarez group. Now it was the Orozco-Gonzalez-Alvarez group that had received the green light from Bustamante Jr., and there was also Grandpa, the father, Bustamante Sr., had received the green light to murder Rascal and Shy Boy. Now supposedly Rascal and Shy Boy were part of the other faction, the Harpies faction. And so as we argued in our briefs, it didn't make any sense, first of all, for the defendant to have been part of a conspiracy to commit murder or to have agreed, because this was a conspiracy to commit RICO, to have agreed to that particular murder. And in fact, Bustamante Jr. put the green light on the defendant later, later in the case. So we don't think that there was any proof of that predicate. As a result, the government had to prove two acts of extortion. I've already indicated that there was one act of extortion. The problem with the second act of extortion relates to the same arguments that we made concerning the conspiracy to commit murder under those two Second Circuit cases of Tellier and Gigante. As you can recall, those cases stand for the proposition that when you have hearsay testimony, like the testimony that was received by Alvarez about the green light hit on Shy Boy and Rascal, that if there was hearsay testimony that was gleaned from what the detective said on the stand, that that would be insufficient to establish that second predicate without some corroboration, something beyond the hearsay, which we didn't have in this case. Now, as far as that dual role instruction is concerned, our position is, is that Detective Trujillo had unmerited credibility in providing lay opinion testimony in any number of areas, and I think that it would be very important to conduct a close study of his testimony. I would start out to make reference to the testimony that Trujillo gave concerning two older murders that occurred in this case. The monikers for these two individuals, Clown and Crook. As you can recall from the testimony of the ex-wife, Crook was supposedly a good friend of the defendants. Without the dual role instruction, the government was allowed to introduce the testimony of Detective Trujillo without the instructing the jury that this witness wore two hats, and that depending on the nature of the testimony, he could either rely upon hearsay or he couldn't. He could rely upon hearsay in rendering opinions concerning the meaning of coded conversations, the wiretap calls, and the use of specific terms which relate to Hispanic gangs. That he could do. We're on plain error review for this particular claim, correct? That's correct. That's correct. We're on plain error review because there was no objection on the part of the counsel for the defendant. And is there a particular area of Detective Trujillo's testimony that's particularly prejudicial? Yes, but I understand that. I understand that like the Vera case, because that was a plain error decision as well, and the government has argued this, that we have to show prejudice, and the prejudice is as follows. In the course of interpreting these wiretap calls, Detective Trujillo was allowed to discuss the past as members of the gang. He discussed the fact that Crook was actually in charge of collection of extortionate payments at the swap meet. He also discussed the role of another gang member by the name of Largo, where, again, he talked about the role of Largo in the gang. Now, this has got nothing to do with interpreting calls. This is not expert testimony now. What this is, is Trujillo's reliance upon hearsay under Crawford, based upon either conversations with fellow officers, reports of investigation, debriefings of informants, or some other source of information to render lay opinions as to the roles of these two key individuals. And the reason why it turns out that this appears to be very important now to establish the prejudice is that in describing the roles of those two individuals, and in particular Crook, who at one time was in charge of the swap meet before he was murdered, and then the Penguin, Grumpy, Alvarez faction moved in, was to allow the detective to opine as a lay witness that the defendant was thereby the heir apparent to taking over the swap meet himself upon his release from prison. And therefore, in his opinion, he was involved in extortionate activities at the swap meet. But if you can recall, there was no evidence as to what the defendant was doing when he was in prison. The government's witnesses testified that they did not investigate him in prison. They indicated that there was nothing in the CDC file to show that he was actively involved in the gang's activities while he was in prison. Unlike some of the other individuals in the case, like another guy named Crazy, who was on an intercepted call with a smuggled cellular phone, or any of the LAIMA members who were up at Pelican Bay that they explained continued to run the mafia operations from prison. There was no evidence of any of that as far as this defendant was concerned. And in fact, Trujillo himself testified that they didn't even start to investigate the defendant until he was released from prison, which was in mid-March. So Trujillo's opinion testimony concerning the defendant's role in collecting extortion payments beyond the one verifiable collection effort that we mentioned establishes a prejudice here. Because in the absence of any proof of the defendant's knowledge of multiple collections of extortionate payments or a conspiracy to commit murder, there was only proof of one extortionate act. Now, as I've indicated, all of this went way beyond interpreting coded words. That's where he was allowed to testify as an expert and to rely upon his past training and experience and any hearsay. For example, debriefings of informants who would have explained to him what the meaning of certain code words were. So everything that he discussed as far as Crook was concerned, as far as what Largo was concerned, was beyond the ambit of his role as an expert witness. Now, in addition to that, Detective Trujillo interpreted a call on June 20th, 2013, involving a discussion of Largo being placed at the swap meet with the defendant at the time of the Vicar threat. Then, after the defendant is already in custody on July 24th, 2010, Trujillo interprets another call involving a little homie, a member of the gang named Nessio, who is collecting extortion payments at Largo's request. And there was some mention in that call that there was speculation that Nessio was picking up for the same people that the defendant was picking up for, which meant that somehow there were multiple extortionate acts that the defendant agreed were to be committed. And Trujillo was allowed again to render his opinion that that meant that the defendant was not just politicking to assume that role, but was actually involved in the collection of more than one extortionate payment during that very small window of time when he was out of custody. Because, as you recall, he was released on March 15th, 2010, he went down to Mexico for a period of time, there were discussions of telephone calls between him and other gang members after his release, and then his return to the Newton Division at the area of the swap meet and the territory of the 38th Street Gang for just a very short period of time before his arrest in July. Again, remember that besides the threat to the security guard, Cervantes, Cervantes could not recall that the defendant had ever collected any extortion payments. Cervantes had testified that in talking to other gang members and vendors at the swap meet that no one could verify that he was ever involved in any such activities. In fact, his testimony was in asking around, he learned that nobody knew him. And Officer Cooney, the LAPD expert, testified that there had been no, actually no written reports of extortion at all, no incident reports of extortion at all. Now, there were other examples of lay opinion testimony that was intermingled with expert testimony that should have caused the court to give this dual role instruction. And I'll go very quickly through a couple of those. You know, you have about four minutes left total, and I assume you'd like to save some time for rebuttal. That's right, I do, but I probably won't need but a couple minutes, so I'll go a couple more minutes here and then I'll sit down. You're not going to discuss the Feretta issue? I'll be happy to go ahead and do that right now. As far as this Feretta issue goes, the defendant's position is that Judge Klausner never spelled out the dangers of self-representation to the defendant. At most, what he discussed was what those dangers might be in the abstract, in the way that he gave the admonition to the defendant. What danger, what additional dangers would you have him spell out? Okay, what he would have, what we think he should have spelled out are what are known as the core functions of representing yourself or of a lawyer's core functions in defending a case, which would be some, and I know that it doesn't have to be specific based upon the various cases reported, but at least touch upon the application of criminal rules of evidence and procedure, the nature of any pretrial motions that should be made, including any dispositive motions, a discussion of how a trained attorney would conduct a trial, jury selection, arguments. Well, some of the admonishments were shortened by the district court's recognition of the fact that he had gone to trial multiple times previously. Right. Is that true, that he had sat through previous trials? Yes, he had been a defendant at trial, Your Honor, but not, he had not represented himself. So he fell more into the. True, but he saw counsel participate in selecting a jury. He saw the direct examination, cross-examination. In other words, he wasn't somebody who just walked into a courtroom for the first time. Well, not exactly sure what he did, because if you remember in this case, at the close of the government's case, he asked to leave the courtroom. So we don't know exactly what he did in the previous trials, but we know like the defendant in below, or blue, who had tried one case pro se prior to the case going up on review as to, on the Peretta question. They found that that was enough. It wasn't enough. The only case that appears to be the outlier, the exception is the Garrison case, which is a situation where the defendant actually tried the case himself on six separate occasions. And I think there's a big distinction between doing that and sitting in a courtroom when somebody else is conducting the trial. Does it matter for the Peretta claim that he actually was represented by counsel at trial? No, because some of the other cases cited in the brief indicate that the Peretta admonishment applies to all critical stages of the case. So that would include pretrial stages, at any time when the defendant might be representing himself, where he'd be arguing. Well, there was one guilty plea. He did represent himself. He did, that's right. He went all the way to the end. And that, I see I'm running a little bit short here, but that relates now to the issue of whether he should have been granted a longer continuance in the case where he represented himself. As far as Judge Wynn asked you, and there is a substantial difference, whatever the legal answer is, between being represented by a lawyer at the actual trial and not being represented. And the only time he was not represented was at the guilty plea. Was at the guilty plea because he indicated he wanted to... And for that particular count, you're in a different position than all the others where he was represented by counsel. That's right. That's right. When he pled guilty. But he did that because he wasn't prepared to go to trial at that time. All right. Thank you, Your Honor. I'll hopefully have at least a minute at the end. Thank you. Good morning. May it please the Court. Justin Rhodes on behalf of the United States. I'll take the issues in the same order that was raised by defense counsel. On the issue of sufficiency of the evidence, the defendant has completely confused the standard. The standard is whether or not defendant was a member of the enterprise and agreed that the enterprise would conduct its activities through a pattern of racketeering, and that means that at least two racketeering acts would be committed by any member of the conspiracy or members of the conspiracy during the relevant time. It doesn't mean that he has to do two racketeering acts. It doesn't mean that he has to know who is going to do the two racketeering acts, only that the gang itself will do that. The evidence of that in this trial was Legion. First, Isaac Alvarez testified that extortion was collected on a weekly basis for many years. Mr. Alvarez himself said he and other gang members would go out on Saturdays and Sundays and collect it and pay it up to more senior gang members. In addition, there was video evidence of Isaac Alvarez actually collecting extortion from vendors outside the swap meet. This is not hearsay evidence. This takes this case entirely outside of the scope of the Second Circuit cases that the defendant has cited in his reply brief. In addition, there are then multiple calls about who is taking over, who is doing the extortion at the swap meet. Defendant is mentioned by name. Defendant who had just gotten out of prison a month or so before, people say, defendant just got out and he's trying to get the homies together and he's trying to take over the swap meet. Then the defendant was seen at the swap meet on the very day that a call was recorded saying defendant and the same people that he was seen with were at the swap meet. What does the defendant do when he's at the swap meet? He threatens the security guard who's trying to keep the gang from acting at the swap meet. And then finally, as the defendant is forced to concede, someone delivered swap meet extortion money to his house. And on a phone call, his brother-in-law says, we dropped off the stuff from the swap meet. And the defendant says, don't talk about the swap meet on a telephone call. The evidence that defendant knew and participated in the conspiracy and knew that the conspiracy engaged in multiple acts of extortion is unquestioned and we shouldn't be looking at which, whether he knew that this one act happened versus this other act. With respect to the conspiracy to commit murder, again, it's not hearsay evidence. Officer Cooney, who patrolled the neighborhood of the gang, said that the gang goes out and engages in shootings all the time and murders happen. Isaac Alvarez, who is a cooperating witness who testified at trial, said that he personally engaged in at least 15 shootings. He then said that he had been tasked by two senior gang members to go out and kill the people who were then collecting or in charge of collecting because they weren't authorized. And then Detective Trujillo and an ATF agent both testified about the firearms that were found on Alvarez when he went out to do that mission. And then there was a recorded call from another leader of the gang saying Isaac Alvarez, a little boy, got arrested at the swap meet with two guns. The evidence that the gang engaged in murders and conspiracies to commit murder was, again, legion. All the jury had to do was agree unanimously on any two of these, and I submit to you that it could have been the specific murder described, the other murders, or the weekly collections of extortion. And the defendant, who is a, let's also point out, a deep, longstanding member of the gang, what he did or didn't do in prison is irrelevant. He is tattooed from head to toe with 38th Street Gang, and I would encourage you to look at the photos starting at GER 718 that show his allegiance to the gang, including the word smoggy tattooed on the side of his head. So the moment he got out of prison, he was deported, came back to the United States, and the calls start happening between senior leaders of the gang saying smoggy's out and he wants to take over extortion. He was in for this, he knew what this gang was about, and he knew exactly what he wanted to happen. It's crazy to assume that the defendant wants to take over the swap meet and doesn't acknowledge that there's a pattern of racketeering activity. He wouldn't take over the swap meet if he knew there was going to be one extortion and one extortion only, and on that basis, the sufficiency evidence falls away. On the jury instruction issue, the government agrees that a dual-purpose instruction should have been given. However, the evidence that was presented shows that there was absolutely no plain error here. Defense counsel got up and said that we should conduct a close study of Detective Trujillo's testimony. Fine. That should have been done in the brief. There is nothing specifically pointed to in the brief about where Detective Trujillo's testimony veered off of what was permissible. And here, at oral argument, defense counsel starts talking about the crook and clown murders. Those are not mentioned in the brief. I'm happy to talk about them, but again, if it was so obvious that Detective Trujillo was not following his role as an expert,  So the one thing that we are talking about now that Detective Trujillo should not have talked about was the attempted murder or the conspiracy to commit murder of two senior gang members named Clown and Crook. That is not relevant to the jury's determination. That was provided as background for how the swap meet works, and it did provide evidence to the jury about conspiracies to commit murder, because Isaac Alvarez said, I went to the swap meet with two firearms to kill Clown and Crook. But that's not what the defendant was convicted of. The defendant was convicted of a pattern of 1962D, which is a conspiracy to commit racketeering activity. His desire or his beef with Clown and Crook, or whether or not they were the same faction, or whether or not it didn't make any sense that he would want to go after them, is not relevant. What's relevant is, did the jury have enough evidence, putting aside entirely Detective Trujillo's testimony to convict him of being a part of that racketeering conspiracy? And I submit to you that there absolutely was. Again, he is smoggy. He's a senior member of the gang. He's talked about on calls between senior members of the gang. He shows up at the swap meet. He threatens a security guard. He goes to jail, and while he's in jail, he has money delivered to him. Lest we also forget that while he was in jail, he approaches Isaac Alvarez, another member of the 38th Street Gang, and what does he ask? He doesn't say, how's the gang doing? He doesn't say, man, I wish I was back out with the gang. He says, who is collecting at the swap meet? That's his concern. That is his desire to participate in the conspiracy. Those are irrelevant and separate and apart from what Detective Trujillo testified about. So I would submit to you that there was no plain error, that even without Detective Trujillo's testimony, there was a wealth of evidence. And that's what distinguishes this case from Vera. Vera, again, let's recall, was remanded only for the specific issue of drug quantity finding because the court pointed out the only evidence on drug quantity in that case was one sale of 28 grams and then the expert's testimony. Here, the expert did decode some calls, and those were very valid decoding. I would point out he said that the word cracked means arrested, that picking up candy means collecting extortion. Playstations and straps are firearms, that the warehouse is the Alameda swap meet, that when a defendant said he was posted on third, not the defendant, this defendant, another defendant said he was posted on third, that means he's standing guard on the corner of 33rd Street. And then he had nicknames for the rival gang members, all things that he had learned because he had spent hours and hours on this case and others. He had listened to over 2,000 intercepted calls on this case alone. He had interviewed cooperating sources. He had participated in search warrants. He had been out on surveillance. I submit to you, Your Honors, that Detective Trujillo was the person in this world most qualified to testify about how these gang members conducted their communications. So he was allowed to testify as he did, but if the court felt that he, you know, overstepped his bounds in any place, and again, those bounds are not set forth in the brief, but if he did, those things that he did testify about are totally swamped by the other independent evidence. How long was this trial? The presentation of evidence portion. It was four days of trial with a break, I think a half-day break. So it was August 13th through the 16th of 2013. And about how long was Trujillo on the stand? He was on the stand for a full day with cross-examination. And I'd like to turn to Ferretta, unless the court had questions about what we've talked about so far. I think Judge Nguyen captured a big part of this, is that all of the other cases that we've talked about, that are talked about in the brief, involve a defendant who waved his right and went to trial and represented himself at trial or herself at trial. Well, that's true as to the illegal entry count. True, Your Honor, but the Ferretta issue is not briefed in that one. I'm happy to talk about it. And as Iowa v. Tovar says in the Supreme Court case, the defendant needs different understandings about the core functions of an attorney, depending on what stage of the proceedings we're at. And for a defendant to enter a plea, he needs to understand less than he does if he goes to trial. Here, the defendant never actually went to trial, per se. What he did, and I submit to you. Yeah, but I think you can discuss them separately. Except for the illegal entry count, he was represented by a lawyer at the trial. Now, I assume your argument is that that cures the Ferretta violation. Certainly as to the trial. And then as to the issue of the illegal reentry, I would submit to you that the admonition that Judge Klausner gave mirrors nearly identically the admonition that Judge Klausner gave, same judge, in the Gerritsen case. And let me point out some of the similarities. He told both defendants that you're held to the same standard as other attorneys. He told both of them that no one else can help you. He told both of them that it's dangerous because you don't have legal expertise. He told both of them that there's numerous pitfalls. He said that standby counsel cannot advise you but would only take over if needed. In this case, he said it's like doing heart surgery on yourself. Whereas in Gerritsen, he said it's like doing brain surgery on yourself. And that in this case, he said he doubts that the defendant would do a good job versus Gerritsen where he said I always advise against the defendant. So those were the similarities that Judge Klausner gave are nearly identical. Now, what defense counsel will argue is that the only the main difference between Gerritsen in this case is that the defendant in Gerritsen had tried several cases on his own. But as he concedes, he had already. Six cases. Six cases, yes. But as. That's considerably different from someone who has not tried a case. True. But let's also recall in Gerritsen, he did try the case. And in this case, he didn't. And it wasn't that some new lawyer was just given to him on the day of trial when he decided he didn't want to go pro se. It was the same attorney who had been. Two. Combining several issues. One is whether the admonition is sufficient. And you're relying on Gerritsen to say that what Judge Klausner said is a sufficient admonition. Yes. And on that point, I don't think there is a substantial difference between being pro se and trying cases and sitting through three criminal trials. Note also he had been deported several times. So he did know. I mean, he's not a rookie to the court experience. And he'd been through these trials. He'd seen the functions of the attorney. And I submit to you that the other thing. Any case that suggests that having been tried before is enough of an admonition? I don't think there's a case that specifically says that. But I would also say that Judge Klausner had been with this defendant for several hearings. Several hearings where he had talked about firing his attorney, talked about strategies he wanted to employ, talked about the frustrations of what he wanted to do versus what his attorneys wanted to do. And in that process, Judge Klausner was able to look at, listen to, and understand the defendant and begin to recognize what his perceptions and what, and that's what it comes down to, what is the defendant's understanding about, you know, the purposes and, you know, benefits of a lawyer. And the defendant fired his lawyer, as I submit to you, not because of a breakdown in communication, but because they didn't want to follow the strategy he wanted to follow. I don't know whether you were here earlier when we had the habeas case and the government took the position that a habeas defendant should know everything about it and if she only incorporates something by reference instead of saying it in detail, that that habeas petitioner should lose because she didn't have that much familiarity with the law. We demand a fair amount of familiarity with the law before, in some views at least, you're held to be able to perform all these great technicalities and you think it's enough that you've just sort of been at a trial before that you're perfectly competent to be a lawyer. You Honor, I hear what you're saying. What I'm saying is that there's also a plus factor in this case. It wasn't just that he had been to three trials, that Judge Klosner had had lengthy discussions with the defendant who was speaking pro se at the time, seeking to fire two separate sets of counsel, talking about the strategies the defendant wanted to employ, and so Judge Klosner had an understanding of who Christian Aguirre was and what he understood about the process. And so Judge Klosner being in the best position then said, let me give you the advisals, the same ones I had given in Gerritsen, and based on the fact that, and he acknowledged, you've been in several trials and I've talked to you, that you now understand and the defendant did understand. And then when, I submit to you, when his strategies that he wanted to employ himself didn't work on the morning of trial, he said, okay, I'll take my lawyer back. You think he would have been capable of trying this case? I think he would have. I mean, I don't think he would have done well, but I think he would have. Unless you have further questions about that, I'll briefly touch on the continuance. He was given 76 days from the date of his first appearance to when he pled guilty in his RICO count, which under the Speedy Trial Act is statutorily sufficient. After he went pro se, he did not ask for a continuance of the immigration case. I think that's notable. He did ask for one in the RICO case, but did not in the immigration case. He litigated. The one motion that he identified was going to be the crux of his defense, and he lost. And then he came in and said, I want to save time for the government, and I'm going to plead guilty. On the racketeering case... Why does that work, if he comes in and he says, well, I want to save the government time, so I'm willing to go to jail for a number of years? Well, he didn't come in and say, because you won't give me more time, because I haven't been able to develop my record. He just said, you know... Your Honor, I don't mean to make light of it. I was only pointing out that what he identified, he did not say, I need more time. On the racketeering case, he was given 54 days from the date that he went pro se till the date that he went to trial, which may not seem like a long time for a racketeering case, but lest we forget, the date he went pro se was over two years from the date of indictment, and he'd had attorneys working for him during that time. So there was no... I wanted to save time for the court and money of the taxpayers. Yes. He was a very kind fellow. He was. Absolutely, Your Honor. Was it, remind me, was it two separate indictments and then they were consolidated or the case got consolidated? Were they going to be tried together? That was the contemplation? What happened was he was indicted with 50 other defendants in 2011 as part of a racketeering case. He was not charged with the illegal reentry at that time. He was charged with that in April of 2013. As the record shows, there was communications about resolving that case, which he said no. The government then sought to consolidate them for trial. He opposed. The court denied the consolidation. So the government was left with two separate tracks. Although the Ferretta hearing happened, Judge Klausner started doing consolidated hearings for the purpose of the Ferretta hearing and firing his counsel. And so that happened at one hearing, but then after that they were on their separate tracks. Unless the court had further questions, I'd submit on the briefs. Thank you, counsel. Thank you. Very briefly, a couple of quick points. The conspiracy to commit murder involving the C.W. Alvarez and Rascal and Shy Boy, the targets, that conspiracy was formulated and the attempt was made before the defendant got out of prison. Now recall that the government spends a lot of time talking about the tattoos that the defendant had. Alvarez had tattoos at the time he was testifying, gang tattoos for 38th Street Gang. At the time he was testifying for the government as its cooperating witness. He was no longer part of the gang at that point. And I just beg the question, does the tattoo of an old girlfriend insinuate that there's a continuing relationship? I don't think so. I think you have to have some evidence that the defendant was actively involved in the affairs of the gang at the time he was in prison. The testimony was that he was trying to get away from gang life before he went into prison, when he was up in Delano living with his ex-wife and working as a crop picker. Now, as far as the citation to specific passages of testimony on the part of Detective Trujillo, I respectfully ask the court to take a look at footnote 8 of the reply brief, which identifies all of the ER sites that relate to that testimony. And the Feretta issue was briefed in the immigration case as well. The problem with that case and the continuance, the denial of continuance at that case was, as you can recall, as you may recall, the judge said to the defendant, look, I'm not going to give you another continuance. I mean, you can file a motion, but I'm not only going to frown upon it, I'm just going to give you three alternate dates and you pick one. And the defendant said, well, I'm not going to do that, Your Honor, you pick one. So the judge picked the date. Now, when that conversation occurred in regard to the immigration case, the defendant had been in quarantine for chicken pox for over 45 days. That's in the sealed excerpts of record at 16. He had not been representing himself prior to the quarantine being lifted. So he had not only had not had any contact with his lawyer prior to that court appearance, but he wasn't running the show. His appointed counsel was running the show. And so I don't think you can conflate the time that the judge was giving to him to prepare for that case with the amount of time that counsel had prior to him going into quarantine. And, in fact, what you had was an appearance on the 20th of June where he then requested to go pro se. We'll give you one more minute. My last sentence. I'm in the mid-sentence of my final comment. No, I'm just going to say that instead of giving him a reasonable time to prepare for that case, explaining why he ends up pleading guilty, the court just chooses the mid-date of July 2nd for trial, which is 12 days after the Feretta hearing took place. And the time prior to that, obviously, as I said, he was in quarantine. He was not in a position to prepare that case, nor was he counsel of record at that time. All right. Thank you, counsel. Thank you very much. The case is targeted will be submitted. The court will stand adjourned for the day. All rise.
judges: Reinhardt, Tashima, Nguyen